DECISION
This matter is before the Court for approval of the report of a special master, appointed pursuant to G.L. 1956 (1984 Reenactment) § 34-28-21.
The petitioner is a construction contractor who contracted to build a home for the respondents in North Smithfield in 1992. The respondents failed to make a final payment as provided by the contract. The petitioner thereupon exercised its rights to enforce a mechanics lien under the provisions of §§ 34-28-1, et seq. When the petitioner commenced this proceeding on February 24, 1993, responses to its petition were filed by the respondents on March 24, 1993, and on March 23, 1993 by Credit Union Central Falls, which has asserted that it holds a first mortgage on the premises. The priority of the mortgage is undisputed. Thereafter, by agreement of the parties, on September 21, 1993, Richard Tallo was appointed a master pursuant to the statute "to ascertain the exact nature and amount of each claim on the property," against which enforcement of the lien was sought in this Court.
The master received evidence at hearings which concluded on July 19, 1995. On November 28, 1995, the master filed his report which is annexed hereto as an appendix. He also requested an allowance of his fees and costs. The master found in effect that the petitioner had a valid net claim, including costs, without adding interest, in the amount of $37,244.51.
On December 1, 1995, the petitioner moved for approval of the master's report. The respondents duly objected to the master's report on December 13, 1995.
They first argue that the report is null and void, because at the time of hearings and filing of his report the master was under indictment in the United States District Court for the District of Rhode Island for the crimes of extortion, mail fraud and conspiracy. Although the respondents have not furnished any competent evidence of the master's indictment and ultimate conviction, the circumstances are plainly subject to judicial notice and are not disputed by the petitioner.
The respondents contend that the Code of Judicial Conduct applies to masters appointed by this Court. They are correct. They further argue that the conduct for which the master was indicted and convicted violated Canons 1, 2, 3 and 4 of Article VI. JUDICIAL CONDUCT, of the Supreme Court Rules.
As to Canon 1, there can be no question. The issue, however, in this case is whether the master's failing to conform to the standards of this Canon are grounds for his disqualification after a hearing and an unfavorable report at the instance of a party who has not been harmed by the violative behavior.
The violation of Canon 2.A. is equally clear, but the question of disqualification of the master after his filing of a report is not answered in this case by reference to the Canon itself.
There can be no doubt that the master has violated Canon 4.A.2, by conducting his extra-judicial activities in such a way that they "demean the judicial office." Once again, however, the question remains whether a litigant, not affected by the judicial officer's misconduct, may invoke that misconduct as grounds for disqualification, after the officer held hearings without any objection by the litigant.
Finally, Canon 3.E.1 does require a judicial officer to disqualify himself or herself in a proceeding where his or her impartiality may be questioned. The respondents do not argue that the master's misconduct rendered him partial to them or their opponents. His impartiality, although not his integrity and honesty, remains unquestioned.
The language of the Preamble to the Code of Judicial Conduct is instructive:
 "The Code is designed to provide guidance to judges and candidates for judicial office and to provide a structure for regulating conduct through disciplinary agencies. It is not designed or intended as a basis for civil liability or criminal prosecution. Furthermore, the purpose of the code would be subverted if the Code were invoked by lawyers for mere tactical advantage in a proceeding." Emphasis supplied.
No one can disagree with the respondents' argument that the master engaged in despicable and degrading behavior which rendered him utterly unfit to hold judicial office. He should have been removed by the Court at the instance of one or all of the parties as soon as he was indicted. The Court might note that the lawyers were somewhat remiss at the time for their failure to comply with Rule 8.3(b) of the Rules of Professional Conduct. The only conclusion this Court can draw must be that the parties' counsel at the time agreed that the master was fit to render an award as to them in spite of his general lack of fitness to continue to serve as a judicial officer.
Put another way, the master's duty to disqualify himself was an obligation he owed to the judiciary and the public, generally, to be invoked and enforced by the judiciary through an appropriate agency. It was not a special duty owed to the particular litigants before him. Furthermore, the record is abundantly clear that, so far from seeking the master's removal, the respondents agreed, albeit with uncommunicated misgiving at the time, to allow the master to continue hearing the matter with their full knowledge of the misconduct of which he was charged and ultimately convicted.
Litigants, as well as judicial officers, have obligations of fairness to the judicial system to which they turn for resolution of their disputes. In fairness to the judicial system, itself, they should have raised such a totally dispositive contention as the disqualification of the hearing officer, before they knew the outcome of the hearing. Under other circumstances the requirement is epitomized as "raise or waive."
The master was not ipso facto disqualified by his indictment. Even a flawed vessel can carry water. The respondents knowingly waived their right to demand his recusal. Their objection to his report on the grounds of his failure to recuse himself has been waived. It is overruled.
Next, the respondents argue that the master has violated some of the technical requirements of R.C.P. 53. The Court finds all of them to lack sufficient merit to constrain it to reject the master's report entirely.
The respondents argue also that the master had no authority to make findings with regard to interest or attorney's fees. They are not correct. The referral to the master was limited to the statutory grounds in § 34-28-21 to ascertain the exact nature and amount of each claim on such property. The lienors are entitled to interest on their claims. See Art Metal ConstructionCo. v. Knight, 56 R.I. 228, 251 (1936). Although profits may be lienable in a mechanic's lien claim, Frank N. Gustafson Sons,Inc. v. Walek, 643 A.2d 179 (R.I. 1994), in the absence of a statutory provision, counsel fees are not. 53 Am.Jur.2d MechanicsLiens § 462 at 443 (1996). The master properly made no finding with regard to interest or counsel fees, and he appropriately left both matters to the Court.
The respondents contend that the master's report is so ambiguous as to defy meaningful review by this Court under Rule 53. They are mistaken. Although the report will never earn a prize for elegance of style or clarity of rhetoric, the master's conclusions and the bases for his findings are easily discerned. The respondents' real complaint is that they are adverse to their position.
The master obviously accepted the testimony of the petitioner's witnesses that the petitioner was entitled to $39,894.54 as the balance due under the contract between the parties, together with agreed changes. He also accepted the testimony of John Douchette as an expert that the deficiencies claimed by the respondents in the petitioner's work were not major, and were readily correctable. As such, the respondents were found to be entitled to relatively small set-offs from the contract price.
The master rejected the testimony of the respondents that the written contract between the parties did not embody their entire agreement or that the work done by the petitioner did not conform to the terms of the agreement, together with the agreed changes and extras. He further chose not to give weight to the testimony of the respondents' experts, John E. Anderson, Benoit Dube, Raymond Limoges and Thomas Cayer. The master propounded his reasons for his declining to give the testimony of these witnesses the weight the respondents believe it deserves. Those reasons appear to this Court to be rational. This Court does not have the benefit of hearing the testimony as it was presented, but the weight to be given conflicting expert testimony is usually a matter for the immediate fact finder. There would be no purpose served by the appointment of a master if the Court was called on to reweigh testimony. A master should be more than a mere collector of evidence. The Court is not persuaded that the master was wrong in his assessment of conflicting testimony.
The master concluded that the respondents were entitled to set-offs from the contract price, amounting to only $4150.00. Each item was described in detail by him. The Court is satisfied that his conclusion is supported by the evidence.
The master reduced the contract balance of $39,894.54 by $4150, leaving a net amount due of $35,744.54, to which he added costs of $1,499.97 in accordance with the provisions of §34-28-19, for a finding of a claim of $37,244.51.
The master found that Credit Union of Central Falls had a prior lien which at the time of filing the petition was in the amount of $125,000.
The report of the master is accepted and approved.
The master will be discharged forthwith. His fees, costs and incidental charges will be considered for allowance by the Court under § 34-28-23 after sale of the property, subject to the prior lien, pursuant to § 34-28-21.
The petitioner will present an Order approving and accepting the master's report as filed.
The petitioner's motion for an Order of sale of the property, subject to the prior lien, is granted.
The master's application for fees, costs and incidental expenses will be deferred pending the sale to determine whether or not there are any proceeds in excess of the prior lien from which he can be paid.
 APPENDIX
 MASTER'S REPORT
 This matter came to be heard on the Motion for Appointment of
a Master made by the Plaintiff in the above-captioned matter and
filed on the 24th day of June, 1993. The Motion contained a
request that a Master be appointed by the Superior Court for
purposes of ascertaining the exact nature and amount of each
claim on the property which is the subject of this litigation or
any part thereof made by either Plaintiff or the Defendants in
this action.
 This claim started as a petition by the Plaintiff to enforce
a Mechanics Lien. The property in question is located at 136
Douglas Pike, North Smithfield and more particularly described as
Plat 10 and Lot 107 on the Assessors Plat of the Town of North
Smithfield. The property as of June 19, 1993 was owned by Donald
and Ann Toupin. The claim of the Plaintiff is for $39,894.54.
Although not argued or entered in this particular case, the
Master did know of the existence of a counter-claim against the
Plaintiff by the Defendants herein for poor workmanship in
construction of a home located in the above-mentioned address.
The Order appointing Richard C. Tallo as Master is dated
September 21, 1993 and signed by Judge Gagnon and states as
follows: "Plaintiffs' Motion for Appointment of a Master is
granted and Richard C. Tallo is appointed Master". It should also
be noted that there is a claim in the file for the Credit Union
of Central Falls under section 34-28-16 of the Rhode Island
General Laws and that the claim is for a first mortgage priority
of all liens for the amount of $125,000.00 which is the amount of
the construction mortgage taken by the Defendants for
construction of their home on the above-mentioned property. With
regard to the claim of the Credit Union of Central Falls, it does
not appear that there is any dispute by either the Plaintiff or
the Defendant. Under the Rhode Island General Laws 34-28-16, the
Credit Union of Central Falls has a first mortgage on the
premises in the amount of $125,000.00 and has priority over any
and all liens including the Mechanics Lien which is the subject
of this litigation. In addition to the claim, there is an
Affidavit filed by Manuela Rocha, Vice President of the Credit
Union of Central Falls duly notarized indicating that the balance
owed on said construction loan and mortgage as of the date of
this Affidavit, which was June 2, 1995 was $112,569.00 and on
deposit in an account with the Credit Union of Central Falls in
the name of Donald and Ann Toupin and Franklin Design Associates,
Inc. as of the same date there was $29,074.00 remaining in said
account, which had not been drawn prior to this dispute.
 The Master received notice of his appointment by letter dated
October 28, 1993. The letter came from Attorney Gaschen the
counsel for Plaintiff. Apparently the Masters name had been
agreed upon by both Plaintiff and Defendants' counsel. Within a
week thereafter, correspondence went out to all parties advising
them of several dates for hearing. After a serious of letters and
phone conferences, it was decided that the parties should meet at
the office of the Master at 1200 Reservoir Avenue, Cranston,
Rhode Island on August 21, 1993 at 2:00 PM. At that time certain
joint exhibits were entered. Those exhibits consists of the
following:
 1. Joint Exhibit 1 is the contract between the Plaintiff and
the Defendants containing 23 pages and a design which is Number
22255 and ending with the Phrase "No land costs included in this
contract". Attached to the copy, which is in the Master's file,
there are three other pages that do not constitute the Joint
Exhibit 1. They are matters which were introduced at a later time
by the Plaintiff;
 2. Joint Exhibit 2 is a set of Architecture Plans entitled
Residence: Mr. Donald and Ann Toupin, Douglas Pike, North
Smithfield, Rhode Island 02895, dated April 17, 1992;
 3. Joint Exhibit 3 is a certified mail return receipt Number
P280940825 signed by D. Toupin;
 4. Joint Exhibit 4 is a Notice of Intention to Claim a
Mechanics Lien signed by George Courtemanche;
 5. Joint Exhibit 5 is a Notice of Lis Pendens signed by
Francis A. Gaschen; and
 6. Joint Exhibit 6 is a Classified Ad in the Woonsocket Call
dated March 3, 1993 advertising the fact that; "Franklin Design
Associates, Inc. has filed a Petition in Equity in said office
representing that Donald and Ann Toupin both of the Town of North
Smithfield, County of Providence, State of Rhode Island are
indebted to it in the sum of $39,894.54 besides interest
according to the amount filed with said Petition for materials
furnish for work and labor performed by said Petitioner . . ."
 The first actual hearing began May 9, 1994 and the first
witness presented by Attorney Gaschen was Mr. Charles Bourget.
Mr. Bourget testified, among other things, that he has been
involved in the construction of over 100 homes. Also Mr. Bourget
met with the Defendants in this matter a few months before they
negotiated a contract and a few times prior to agreeing on a
price. Finally, a contract was entered into and executed by all
parties on April 23, 1992, which is represented by Joint Exhibit
1 and it was testified by Mr. Bourget that construction started
within approximately 30 days. Further, the Plaintiff did site
preparation work. Apparently, after a considerable time on the
job there arose a dispute regarding the type of windows which the
Plaintiff and Defendants had agreed upon. The Plaintiff issued a
stop work order until the situation was resolved. There was
testimony by all parties that the situation was resolved in such
a manner that construction was able to proceed and that the
Defendants had indeed agreed or at least realized that the
contract contained the type of windows that were in fact being
installed by the Plaintiff. Further testimony from Mr. Bourget,
indicated without dispute that all changes were authorized by the
Defendants and when the home was, for all intents and purposes,
completed there were minor punch list items left to be done. That
the total balance due at the time that worked stopped, because of
a second and final dispute between the parties, was $39,894.54.
There was some testimony that the Defendants simply offered the
Plaintiff a sum of money such as $125,000.00 because the
Defendants had various complaints. What those complaints were, of
course, are the subject of the Defendants case in this matter.
There was testimony that the Plaintiff is looking for interest
and legal fees in accordance with the contract which is entered
as Joint Exhibit 1.
 The next hearing date was on October 13, 1994, when Mr.
Bourget continued under direct examination by Mr. Gaschen. At
that point, Mr. Bourget testifies basically about the change
order. Additionally, he testifies about the deck which he states
was originally to be pressure treated but the Defendants changed
it to a redwood or other species of wood that the Defendants
wanted. In testimony by Mr. Bourget, he stated that the Toupins
went to Peppin Lumber and chose the wood themselves and their
choice of wood and their redesigning of the deck resulted in a
larger size deck and that resulted in the change order of
approximately $3,303.80. In this way, Mr. Bourget testified that
the items on the change orders were approved by all parties. Mr.
Bourget testified that the punch list items although they may
have been valid complaints were essentially minor and were not
done because the Defendants would not release the final payment.
The Plaintiff testified that the complaint by the Defendants
concerning the strap marks on the bricks were not valid since the
bricks were chosen by the Defendants and since the bricks were
chosen with regard to the price range that the Defendants were
willing to pay and they could with some very minor remedial work
lessen the effect of the strap marks. Mr. Bourget testifies that
the deck was approximately 80 percent finished with 20 percent
left unfinished because of the final dispute and the refusal of
the Defendants to sign off on the last check. He stated for the
record that the balance due at the time of the Mechanics Lien was
$39,894.54.
 Under cross examination, Mr. Bourget's testimony appeared to
be consistent and he appeared to have a good deal of experience
in the construction industry and his testimony appeared to be
forthright and candid. He also indicated that the $3,300.00
should have been reduced by 20 percent or approximately $660.00.
 The October 13, 1994 hearing Mr. Courtemanche, who is the
other principle of the Plaintiff' company, also testified. Mr.
Courtemanche testified that he and Mr. Bourget came up with the
final price based upon their notes and the invoices which they
kept in the ordinary course of their business. There is no
dispute as to the authenticity of any of these invoices nor the
materials that went into the Toupin home. Mr. Courtemanche
testified as to what the company had been paid to date and what
the company was owed. That testimony indicated that the company
was owed $39,894.54. Essentially, the balance of Mr.
Courtemanche's testimony substantiates Mr. Bourget's testimony
with very little deviation. Under cross examination, it appeared
that the Plaintiff did everything with a few minor exceptions in
accordance with the contract and that some of the items on the
punch list would have been done had the agreement to sign the
final check been forthcoming.
 On July 13, 1995 at 12:00 PM, I as court appointed Master
viewed the home at 136 Douglas Pike, North Smithfield, Rhode
Island. The next hearing was held on May 10, 1995 even though
that particular transcript is dated May 23, 1995 the hearing was
actual on May 10, 1995. At that hearing, the Plaintiff presented
the testimony of John Douchette from Commonwealth Engineering,
copy of his curriculum viti is attached to the transcript dated
May 23, 1995 and marked as Plaintiff's Exhibit 1. Plaintiff's
Exhibit 2 is a statement of claim sent by the Defendants to the
State Building Code Commission. Mr Douchette in doing his
appraisal of the complaint made by the Defendants followed the
items specified in the Defendants' Statement of Claim to the
State Building Code Commission when he made his inspection of the
premises. Mr. Douchette was accepted by the parties as an
engineering expert and then went on to testify about each and
every item which the Defendants had claimed were defects or left
undone. Mr. Douchette walked the site with the homeowner and went
through each item on the homeowners' complaint sheet and asked
the homeowner to show him specifically what the homeowner was
referring to in his complaint. Mr. Douchette went through these
items one by one, he inspected them, took notes, took dimensions,
took some pictures in certain cases, and basically took the
information as provided by the homeowner. His findings are
included in a full exhibit delineated as Plaintiff's Exhibit 3.
Essentially, Mr. Douchette said that the fireplaces could be
modified to correct the deficiencies outlined by the Defendants
without performing the complete removal and replacement proposed
by the Defendants' own expert witnesses and that these defects if
any were relatively minor, they did not render the fireplaces
either dangerous or a fire hazard, and that any changes were
indeed considered minor. Mr. Douchette went through each and
every item in this fashion and found only minor and mostly normal
types of defects which could be easily remedied with only very
minor expenditure if any at all. Essentially, the only major
problem Mr. Douchette found was what he delineated as Item No.
12, that is the concrete walkway to the front entrance was
uneven. However, he did not indicate that the condition was
created by the Plaintiff since he stated, "this condition may
have been created by the homeowners when the homeowners had the
front lawn regraded with 40 cubic yards of loam fill." There was
a recommendation that the sidewalk be replaced with a new
sidewalk to provide a positive slop to the driveway. It does not
appear that there was any further testimony in this regard. After
Mr. Douchette testified, Mr. Bourget then gives his estimate of
the items found to be in need of work. He said such items as
brick work in the fireplace would be no charge because the mason
would return to make repairs without charge. He states the cracks
in the concrete slab is approximately $55.00, that the anchor
bolts would be $75.00, that the steel anchor lines would be
$100.00, and that it would be approximately $250.00 to redo the
counters. In addition thereto, Mr. Bourget latter testifies that
the mason work would cost about a $1,000.00 if it was done by
someone other than the original mason. On cross examination, Mr.
Platiau went over the items that were in the Defendants initial
complaint list. Also, Mr. Platiau began to discuss the recut
floor truss. There was some question about whether or not the
floor truss had been cut in order to accommodate the fireplace
and the fact that the floor truss after it had been altered was
not recertified by an engineer and inspected by the building
inspector. There was some question as to whether or not this
modified floor truss would in fact effect the structural
integrity of the property. Although, Mr. Douchette said that it
could technically effect the structural integrity but that there
was no testimony one way or another as to whether or not it did
in this particular case. When I questioned Mr. Douchette as to
whether or not these types of repairs that he indicated were
needed were major, he stated that they were not indeed major but
typical types of repairs that you would see and would be taken
care of on a punch list. He stated, "These items, there all
correctable and normally the builder is allowed to go in and do
these repairs. When you leave these repairs unattended it only
makes the situation worse. Obliviously, if the roof has a leak in
the chimney and you allow that to continue to leak its going to
damage timber, sheet rock, damaged insulation, damaged plywood
sheeting for the roof; its just going to rot things gradually
— to get into a worse condition." When I further questioned
him regarding whether or not he saw any of these worse
conditions, he stated he did not.
 The next hearing date was June 1, 1995 and on that date, the
Defendants began to present their case. Mr. Platiau began
examination of Mrs. Toupin with how it came about that she first
contacted the Plaintiff in the matter of building a house for her
and her husband. There was evidence that the original plans the
Defendants had submitted to the Plaintiff was of a house which
turned out to be somewhat more costly than they were prepared to
spend. That through many negotiations and meeting the Defendants
with the Plaintiff agreed on a final purchase price. It appears
that price was embodied in Joint Exhibit 1. This is the case even
though Defendants offered their copy of a contract which was
marked as Defendants' Exhibit A. Defendants presented their
Exhibit A which was essentially the same as Joint Exhibit 1
except it did not contain a page which indicated that the
Defendants would be responsible for attorney fees. However, since
all parties agreed to Joint Exhibit 1 and since Joint Exhibit 1
was signed and dated by all parties, I find as a fact that Joint
Exhibit 1 is the contract that governs the relationship of the
Plaintiff and Defendants in the matter before me. Essentially,
there appears to be no dispute at least as to what Mrs. Toupin
wanted, as she herself stated on Page 9 of the transcript of June
1, 1995, "we wanted a lot of clarification of contents before we
would sign the contract because we had a lot of concerns how
things were worded and exactly what we would be getting for our
money." It appears from this statement and several others
throughout the transcript and the testimony of both Mr. Mrs.
Toupin that they certainly had a grasp of what they were doing
and they were certainly aware of the need for caution and to be
advised by architects or counsel before they signed the agreement
which they ultimately did on the 23rd of April, 1992. Mrs. Toupin
was questioned about the quality of the bricks and she indicated
that she said to the Plaintiff she wanted a solid brown brick.
She did not want to have any defects in it and wanted the brick
of the proper quality. This there is no testimony whatever that
the bricks that were installed were not good quality or were not
worth the 28 cents a brick which they apparently were charged for
them. Mrs. Toupin's next concern was the windows and again
although there was some discussion prior to the contract being
signed, there appears to be no question at all that the type of
window which they contracted to for was exactly what they got;
namely, wooden clad windows. Her testimony essentially is that
things were said and promised to them that were not embodied in
the contract which was later signed. It is difficult to see how
the Defendants can then say they did not have an opportunity to
view the contract since they testified that they actively
participate in negotiating it. There seems to be a contradiction
in the testimony of the Defendants wherein they indicated that
they were concerned about the overall price of the home, however,
on many occasions one or both the Defendants testified that they
questioned the adequacy of allowances. Surely, the Defendants
could not fail to see the connection between allowances and cost
of the final construction. It appears that the Defendants wanted
on the one hand to keep their prices down, as of coarse all
homeowners would, but on the other hand, they may have been
expecting more than their money was capable of purchasing.
 The questions for me to decide is whether or not they actual
received what they paid for and what the contract called for.
Essentially, most of the testimony of Mr. Mrs. Toupin discusses
things that were ultimately in the contract and this testimony
would have been excluded under the parol evidence rule unless of
course there was some evidence fraud or mistake. In this
particular case, there is no evidence of fraud, there is no
evidence of mistake, but even without excluding the evidence of
both parties the evidence of Mr. Mrs. Toupin appears, if
anything, to verify what ultimately began as a written contract
which contained all of the elements of there agreement.
Therefore, I find as a fact that the Joint Exhibit 1, which is
the written contract, signed by both parties on April 23, 1992 is
an instrument which contains all the aspects of the agreement
between the Plaintiff and Defendants and that the testimony of
the Defendants as to things outside of that contract is not
supported by any other evidence in this particular case. It is
undisputed that the testimony of both Mr. Mrs. Toupin cannot be
used to alter or vary the contract which they signed after all
the negotiations have been completed and I find as a fact that
they do not vary the terms of the written contract which was
entered as Joint Exhibit 1 particularly with regard to the
materials supplied and the work that was to be done by the
Plaintiff. Additionally, with the matters of attorney fees, I
find the contract which was in Joint Exhibit 1 does provide for
attorney fees. It appears that not only was the contract the
final agreement of parties but that any alterations would have to
be agreed upon and there would be an extra charge for them. Cross
examination of Mrs. Toupin by Mr. Gashen brought out also that in
one of the sections of the contract it was suggested that the
Defendants contact a competent attorney, architectural
contractor, or material dealer in your vicinity who have
professional knowledge and good judgment. Throughout Page 111 and
112 of the June 1, 1995 transcript there does not appear to be
any question at all that the Defendant Mrs. Toupin certainly
understood the contract and had opportunity to discuss it with
anyone she wanted to prior to signing it.
 The next hearing took place on June 5, 1995 and at that time
Mr. Donald Toupin the Defendant testified. Mr. Toupin said
essentially the same thing that Mrs. Toupin said with regard to
negotiating matters that eventually found there way into the
contract. He further testified on the top of Page 20 of the
transcript dated June 1, 1995, that when asked whether or not he
read the document which is Joint Exhibit 1 dated April 23, 1992
he stated, "not really. She was due anytime, we were both kind of
nervous, both kind of anxious to get the house going. We just
kind of quickly signed it, he was and went on his way." Mr.
Toupin's testimony indicates that he certainly had an opportunity
to review the contract. Throughout his testimony, Mr. Toupin
repeatedly stated he was unsure whether or nor he brought these
matters to the attention of the Plaintiff. He does not recall
whether or not he discussed his complaints about the brick or
several other things, and his memory is not good with regard to
several items that appeared to be his concerns.
 The next hearing took place on June 15, 1995. At that time,
the heating system was discussed and various other things
including bathroom counters and sinks and whether or not the
sinks would have laminated tops or another type of top.
Essentially, the same type of testimony took place that occurred
earlier with the exception of the Defendants talking about
obtaining a occupancy permit on or about October 23, 1992. They
stated that the fireplace was not working properly shortly after
they moved in. They questioned the Plaintiff on this but the
Plaintiff said the fireplace was okay after they made an
inspection. Also the Defendants testified that they did not sign
the check on the date that it was presented to them because they
had several questions and wanted these things completed before
the check was signed. Further, Mr. Toupin in fact has testified
earlier that he made an offer to the Plaintiff of substantially
less than what was owed Plaintiff for a complete settlement which
the Plaintiff refused.
 The next hearing was on the 27th of June, 1995. At that time,
the testimony of Mr. Toupin was completed and one of the experts
presented by the Defendants, Mr. Anderson was presented. After
Mr. Anderson qualifications were submitted, he testified that he
made an inspection of the house but to a large degree depended
upon certain estimates made by another person who was never
offered as a witness in this case. I have reviewed Mr. Anderson's
testimony in detail and I find that it may be helpful in
assessing several things which could have been done if this were
another contract or if another arrangement had been made but as
far as finding any defects aside from the question of the truss,
I find that there is nothing which is greatly different from the
evaluation which was given by Mr. Douchette; namely: the matters
which were considered defects were those things which were not
completed because of the dispute over the last payment.
Additionally, I find that any other thing which might have been
considered a defect could possibly have been caused by lack of
attention to the matter as soon as it was noticed by the
Defendants. Some of the figures that Mr. Anderson proposed, for
the estimated cost of repairing alleged defects in the fireplaces
amounted to more than 25 percent of the total cost of the house.
On close examination, this estimate, even if allowed, seemed
offered for the purpose of not repairing, but constructing a new
fireplace. Further, there was competent testimony from one of the
principles of the Plaintiffs that it was not necessary to tear
down the fireplaces and rebuild them but simply doing some
relatively minor work would eliminate whatever problems were
occurring in the operation of the fireplaces.
 The next hearing was on June 29, 1995. At that time Mr.
Benoit Dube, who was a heating insulation expert testified. After
reviewing his testimony, he essentially said that the flue which
was placed in the fireplaces of the Defendants' home could have
been larger, however, the flue did meet the building code
requirements. In fact on cross examination, Mr. Dube stated that
there was no evidence that the building code prevented multiple
appliances from being installed on one flue as was the case in
this construction. From Mr. Dube's testimony, we move on to Mr.
Limoges, who was presented as a mason expert by the Defendants.
Mr. Limoges testified on Page 41 of the transcript dated June 29,
1995 that the fireplaces did not work properly in his opinion
because of several cracks in the flues, however, there is no
evidence that he attempted to light the fireplace nor that he did
any tests other than a visual inspection of the fireplace which
disclosed cracks in the flues. These cracks, however, did not
appear to be something that would usually or necessarily cause a
fireplace to be rendered useless. The rest of his testimony in
which he talks about such things as the necessity or lack thereof
of a particular brick shelf and whether or not the fireplaces met
code are all things which the Defendants' witness does not
identify as defects, but rather simply methods of construction
which meet the code and which presently do not evidence any
structural defects. On Page 80 of the June 29, 1995 hearing at
11:00 AM, Mr. Limoges testifies that the insulation of flashing
would keep moisture away from the sills. Also there are several
minor remedial measures which could be taken to rectify any
damage that may occur. This he says even though there is no
evidence that there is any moisture around the sill or any where
else because of the lack of the installation of a brick shelf.
 The next hearing was on July 19, 1995 and on Pages 5, 6 and 7
of that transcript Mr. Bourget testified that those flues could
be corrected with epoxy cement that could be poured down the
chimney to fill any and all cracks. Also Mr. Bourget addressed
the question of excessive motar between some of the bricks that
made up the fireplaces and he testified that it could be readily
corrected. The costs for these things are estimated to be between
four and five hundred per flue and there were two flues in
question so I have found that in giving the Defendants the
benefit of the doubt I will allow $1,000.00 to make these
corrections.
 The final witness for the defense was a Mr. Thomas Cayer who
was employed by Cayer Construction Company and was qualified as
an expert in general residential construction. Mr. Cayer's
testimony was essentially a repeat of earlier testimony. He had
divided his viewing of the premises into three categories and
preceded to give testimony on each category. He stated for
instance on Page 12 of the June 29, 1995 hearing marked 2:00 PM,
"the foundation of the building did not sit properly or the
building did not sit properly on the foundation wall." However,
he did not state how he felt this would effect the integrity of
the structure. The statement was left just as it was and then Mr.
Cayer went on with his testimony. Through all his testimony he
simply stated what he felt should have been done in the
construction of the house. Another example of Mr. Cayer's
testimony being equivocal was on Page 14 of the transcript of
June 29, 1995 at 2:00 PM in which he states in answer to an
inquiry regarding the cracks in the foundation that they could be
caused by a number of reasons, "perhaps one would be that the
soil was not properly compacted prior to pouring the foundation
wall. Another could be that the cement mixture in the concrete
itself was not sufficient enough." Mr. Cayer's testimony
continues in such a manner with regard to each and every item on
the his list so I do not think that it adds significantly to the
Defendants' case.
 After listening to all the testimony for several months and
rereading the transcripts a number of times as well as checking
my notes, I find as a fact that the Plaintiff has complied with
and filed a proper Mechanics Lien. I further find that based upon
the testimony presented by the Plaintiff they have shown that
they owed exactly $39,894.54. With regard to set offs, I find
that set offs regarding the unfinished deck should be $660.00,
that the cost to repair items on the punch list was $480.00; that
the error in computations which should be credited to the
Defendants should be $1,000.00; that there should be a credit of
$30.00 for kitchen laminates; $200.00 for lights, jacuzzi, fan,
extra outlet, etc.; that there should be a credit of $300.00 for
sinks; a credit for a $100.00 for bolting; also a credit of
$1,000.00 to repair the flues; also there should be a credit of
$55.00 allowed for cracks in the slabs; and $75.00 allowed for
anchor bolts. According to the testimony of Mr. Bourget himself,
$250.00 to redo the counters. The total credit to the Defendants
for set offs are $4,150.00.
 Therefore, I find for the Petitioner in the amount of
$39,894.54 as the balance due under the contract minus the amount
of set offs which have been previously stated for an award of
$37,244.51, which includes costs of $1,499,97. With regard to
interest, I will leave that to the Court since I do not believe I
have authority to award interest; however, I see no reason why
interest should not be granted from the date of the filing of
this action through the date of my decision. Also with regard to
counsel fee, I will leave to the Court as well but I clearly find
that there is a provision for a counsel fee in the contract
between the Plaintiff and Defendants. I find that the Plaintiff
have expended costs in the amount of $1,499.87. Also I am
requesting that the Court allow the funds presently on deposit
with the Credit Union of Central Falls to be released and be used
first to satisfy the Master's cost and fees in this matter and
than to satisfy to the extent possible the balance due the
Petitioner. Finally, that the Defendants be ordered to pay the
balance to the Plaintiff remaining forthwith.
 Presented by,
 _________________________
 RICHARD C. TALLO, (T0504)
 1200 Reservoir Avenue
 Cranston, RI 02920
 (401) 944-8200
 Fax: (401) 944-8483
 CERTIFICATION
 I hereby certify that I mailed a true copy of the within to
Francis A. Gaschen, Esquire, 255 Main Street, Pawtucket, Rhode
Island 02860; Paul E. Platiau, Esquire, 1160 Park Avenue,
Woonsocket, Rhode Island 02895; and Ernest J. Pratt, Esquire,
150 Main Street, P.O. Box 2436, Pawtucket, Rhode Island 02862 on
the 28th day of November, 1995.
 Jena Moscatelli